# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 26, 2016 Session

## JOHN C. HOYNACKI ET AL. v. JEROME HOYNACKI

**Appeal from the Circuit Court for Washington County**
**No. 33286      Jean A. Stanley, Judge**

---

### No. E2015-02084-COA-R3-CV-FILED-OCTOBER 31, 2016

---

Plaintiff John C. Hoynacki was helping his father, defendant Jerome Hoynacki, wax defendant's recreational vehicle (RV). He worked on a ladder in reaching the high places on the RV. The ladder fell with plaintiff on it, causing him injury. He brought this negligence action, alleging that defendant breached his duty to exercise reasonable care in securing and stabilizing the ladder. The trial court granted defendant summary judgment, holding that defendant had no legal duty to hold the ladder at the time the plaintiff attempted to "climb down prior to his accident." We hold that there are genuine issues of material fact regarding whether defendant was negligent under the circumstances. We vacate the trial court's grant of summary judgment and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

F. Clinton Little, Eric B. Foust, and Dan Channing Stanley, Knoxville, Tennessee, for the appellants, John C. Hoynacki and Sally A. Hoynacki.

James E. Rasnic, Bristol, Virginia, for the appellee, Jerome Hoynacki.

## OPINION

## I.

On the weekend of Saturday, June 1, 2013, defendant and his wife were camping in their RV, a thirty-five-foot Winnebago Adventurer, at a park in North Carolina. Defendant phoned plaintiff, who lived nearby, and asked him to help wax the RV.

Plaintiff agreed and brought over his ladder, *i.e.*, a five-foot, folding A-frame type made of fiberglass. The two men washed the RV and began waxing it on Saturday. When the RV's height required the use of a ladder, plaintiff got on it to wax the top parts, and defendant stayed on the ground to help stabilize and secure the ladder. The ladder was used without incident on that Saturday.

On the following Sunday, as they were finishing the waxing job, plaintiff was on the ladder in the front of the RV, working on the part of the RV above the windshield. The ladder was positioned such that the rungs of the ladder were parallel to the length of the RV, requiring plaintiff to turn to his right on the ladder. The ground in front of the RV sloped away from the RV, so that the left side of the ladder was lower than the right side. Plaintiff testified that defendant had placed the ladder in its position right before the accident. Defendant then walked around to the other side of the RV, some fifteen feet away. Plaintiff finished working on the section above the windshield, and as he started to descend the ladder, it fell away from the RV, carrying plaintiff with it. He suffered serious injuries in the fall.

Plaintiff brought this negligence action, alleging defendant breached his "duty to exercise due care in the selection of the work site, in the placement of the ladder, and in holding the ladder in order to prevent unreasonable risks of harm to the [p]laintiff." Defendant answered, denying negligence; following discovery, he moved for summary judgment. The trial court granted the motion, finding and holding as follows:

> Defendant held the ladder each time plaintiff climbed up to make sure it was stabilized. Defendant did not continue to hold the ladder while plaintiff worked; and defendant did not hold the ladder each time plaintiff climbed back down; however, plaintiff testified by deposition that if defendant felt the ladder was unsafe or unstable, defendant would hold the ladder until plaintiff finished an area.

> Just before the accident, the ladder was positioned at the front of the RV and plaintiff was on the ladder applying wax above the driver's windshield. At this location, all four feet of the ladder were on an asphalt surface. Defendant believed the ladder was stable because all four feet were on the ground and it did not rock.

> Defendant held the ladder as plaintiff climbed up. Defendant did not continue to hold the ladder, but walked away and around the corner of the RV. Plaintiff did not know where

2

defendant was while working the last section, nor did plaintiff see defendant at any time while working the last section.

\*     \*     \*

Plaintiff worked on the area above the driver's windshield about 2 – 4 minutes.

While applying wax to this area, plaintiff never felt the ladder move or wobble, nor did it ever feel as if it was not stabilized.

\*     \*     \*

After plaintiff finished the area above the driver's windshield but before descending his ladder, he did not look to see if anyone was holding the ladder. Neither did he communicate to anyone that he was going to climb down the ladder.

Plaintiff testified in his deposition that as he started to climb down, the ladder fell to his left.

There is no evidence of any defect in the ladder or the asphalt in the area where the ladder was placed.

\*     \*     \*

Upon consideration of these undisputed material facts, the Court concludes and so finds that for a period of two (2) to four (4) minutes, plaintiff worked on the RV while standing on the ladder without incident; that during this time, the ladder neither moved, wobbled, nor felt unstable to plaintiff; and that the ladder was properly stabilized in its final position prior to plaintiff's accident. The Court finds as a matter of law under these circumstances, that defendant had no legal duty nor did he assume any such duty to hold the stabilized ladder while plaintiff attempted to climb down prior to his accident; that absent a legal duty, there is no breach; and that absent a breach of a legal duty, plaintiff's negligence claim in this case fails.

3

(Numbering in original omitted; words "John" and "Jerome" in original replaced respectively with "plaintiff" and "defendant" throughout.) Plaintiff timely filed a notice of appeal.

## II.

The issue raised by plaintiff is whether the trial court erred in granting defendant summary judgment.

## III.

Regarding our standard of review of a grant of summary judgment, the Supreme Court has recently determined:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.
>
> *          *          *
>
> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (emphasis in original).

In making the determination of whether summary judgment was correctly granted,

> [w]e must view all of the evidence in the light most favorable
> to the nonmoving party and resolve all factual inferences in
> the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*,
> 271 S.W.3d 76, 84 (Tenn. 2008); *Luther v. Compton*, 5
> S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox Cnty. Bd.
> of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed
> facts support only one conclusion, then the court's summary
> judgment will be upheld because the moving party was
> entitled to judgment as a matter of law. *See White v.
> Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v.
> Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Wells Fargo Bank, N.A. v. Lockett*, No. E2013-02186-COA-R3-CV, 2014 WL 1673745, at *2 (Tenn. Ct. App., filed Apr. 24, 2014).

## IV.

Plaintiff's cause of action sounds in negligence. "In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: '(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.' " *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). "The first element, that of duty . . . is the legal obligation of a defendant to conform to a reasonable person's standard of care in order to protect against unreasonable risks of harm." *Id.* (citing *Burroughs v. Magee*, 118 S.W.3d 323, 328-29 (Tenn. 2003)); *accord Cullum v. McCool*, 432 S.W.3d 829, 833 (Tenn. 2013). Whether a defendant owes a plaintiff a duty of care is a question of law to be determined by the court. *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005); *see Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) ("In the end, whether a defendant owed or assumed a duty of care to a plaintiff is a question of law for the court to decide."). "The question of whether a defendant breached the duty of care, on the other hand, generally is a question of fact for the finder of fact." *Eden W. ex rel. Evans v. Tarr*, No. M2014-01491-COA-R3-CV, 2015 WL 2210155, at *3 (Tenn. Ct. App., filed May 8, 2015).

In analyzing the question of duty, "the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm." *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998). In *Rice*, the Supreme Court observed that "[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by

defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* (quoting *McCall*, 913 S.W.2d at 153 (internal quotation marks omitted)). "Although all the balancing considerations are important, the foreseeability prong is paramount because '[f]oreseeability is the test of negligence.' " *Hale v. Ostrow*, 166 S.W.3d 713, 716-17 (Tenn. 2005) (quoting *Biscan v. Brown*, 160 S.W.3d 462, 480 (Tenn. 2005)).

In this case, plaintiff asserts that defendant assumed the duty to act with reasonable care to ensure that the ladder was placed in a stable location and that it remained stable and upright while plaintiff worked on it. The Supreme Court has recognized that "[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Biscan*, 160 S.W.3d at 482-83 (quoting *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000) (internal quotation marks omitted)); *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007); *Messer Griesheim Indus. v. Cryotech of Kingsport*, 45 S.W.3d 588, 604 (Tenn. Ct. App. 2001) ("it is clear that one who assumes to act assumes a duty to act with reasonable care").

The proof presented to the trial court consists primarily of transcripts of the parties' depositions and exhibits thereto, including photographs of the RV and the area where they were working. Plaintiff testified, in pertinent part, as follows:

> [W]e would work close to each other, I believe, for the most part. I don't think we separated too often if we did. And we would work one section at a time to put the [wax] material on. And if the ladder was needed either [defendant] or I, sometimes changed based on who was holding the materials because the material would spill, it was a liquid. So there was a pan of materials, somebody would hold the material while the ladder was moved.
>
> \*    \*    \*
>
> A. So we would, if I moved the ladder, since we were nearby and the ground was uneven on the sides, there was gravel so there was areas, either [defendant] or I would move the ladder to the next location. And if, he would stand beside it and if it was unsafe, this was all non-verbal communication, I've worked with him many years. I would go up the ladder and he would, he would hold it while I would walk up it, go up it and make sure it was stabilized. If he felt it was unsafe or unstable he would hold it until I finished an area. If he had

6

determined if it was safe or it appeared safe he would work right below me in an area until we finished that[.]

* * *

Q. And you said, although it was non-verbal communication, and that being because you had worked with your dad before, that there were certain times because of the way the ladder was positioned on the ground that it was either stabilized by itself or it wasn't, true?

A. Correct.

Q. All right. And based upon [defendant's] experience you're telling me that on occasions when the ladder was not safe or he felt it was not stabilized he would hold the ladder while you worked on the upper areas?

A. Yes.

Q. And likewise, or conversely where he felt that the ladder was in fact stabilized or safe he would not continue to hold the ladder while you worked on the upper areas but he would work below you on the lower areas?

A. Correct.

* * *

Q. How long do you think you would have been on the ladder applying the material before you started back down?

A. I would estimate two to four minutes.

Q. At any time while you were applying the material at this last position did you ever feel the ladder move or wobble or did it ever feel to you as if it was not stabilized?

A. No.

7

Q. Okay. Tell me what you remember exactly about your movement and the actual fall, okay? You're on the ladder, you've finished. Tell me what happens?

A. Standing on the ladder, set the applicator on the top and I grab the ladder with two hands. As soon as I started to make a movement with one foot or the other, I'm not sure which one, the ladder simply fell to my left. I didn't fall off the ladder. The ladder fell and I held onto the ladder and rode the ladder toward the ground. So the ladder . . . would be what you'd call perpendicular to the windshield. . . . So the ladder fell to my left.

\*     \*     \*

Q. But while you were up there doing that, even in the leaned position as you've described, did you feel any instability at all or shifting or movement of the ladder?

A. I didn't. I don't recall, I don't think so because I continued to work and I didn't, I continued to finish the work.

Defendant testified as follows:

Q. Okay. How many times, if you remember, did you hold the ladder for him?

A. The motor home is 35 feet long. We must have moved that ladder several times down the length of the motor home to cover the whole surface. So 35 feet divided by two, there would be 12 moves to a side, two sides, 24 moves, across the back probably three more, 27 moves, maybe 30 moves all together about.

Q. So did you hold the ladder for him each time he got on the ladder?

A. To be sure, yes.

Q. And then once he got on the ladder did you continue to hold the ladder for him?

8

A. No.

Q. Ever?

A. I can't say never but rare.

Q. If the ladder was unstable, would you hold it for him?

A. Absolutely.  We'd make sure it was stable first.

Q. I'm sorry, could you repeat that?

A. Make sure the ladder was stable first before I left it.

Q. So just so I'm understanding correctly, if [plaintiff] went up on the ladder and it was stable you wouldn't hold it?

A. True.

Q. But if it was unstable you would hold it?

A. He wouldn't go up on it. He would move the ladder, keep the ladder stable first.

Q. Okay.  So you're saying that he never would have gone up on a ladder that is unstable?

A. True.

*     *     *

Q. And then what do you remember happening next?

A. The ladder was stabilized.  He had his supplies.  He went up the ladder.  I left him, went around the side of the coach with Jackson [plaintiff's son] to finish polishing a section on the side of the coach then heard John hit the ground, thump.

Q. Okay. When he went up the ladder were you holding it for him?

9

A. Yes, it was stable.

Q. When he had come down the ladder previously had you ever been holding the ladder for him?

A. I don't recall.

Q. Okay. Is it possible that you did?

A. Possible but I don't really . . .

Q. You don't remember?

A. No.

*     *     *

Q. If he had gotten up on a ladder that was unstable you would have held it for him?

A. I would have moved the ladder, we would have moved the ladder.

Q. You would have held it for him first though?

A. That's right then moved it to a safer location.

Q. Okay. So before he fell you were holding the ladder for him and he gets up on the top of the ladder, correct?

A. Yes.

Q. And then did you just think that it was stable, that's why you left?

A. Yes.

Q. Okay. How did you make that decision?

A. Four feet were on the ground and it didn't rock.

10

Q. When he was on it, it didn't rock?

A. That's right.

Q. Is that what you did basically every time the ladder was moved?

A. Yes.

Q. If you felt it was stable you didn't think you needed to hold it?

A. True.

Q. Did you ever tell [plaintiff] that you were holding the ladder or were not holding the ladder?

A. Maybe initially because we worked two days, probably did that several times.

*       *       *

Q. Okay.  So when [plaintiff] went up on the ladder the last time you stopped holding it and you went somewhere, where did you go?

A. To the other side of the coach to work with Jackson on the driver's side over there for a while.

Q. So how far away from [plaintiff] were you when he fell?

A. Fifteen, 20 feet maybe.

Q. Okay. Was your back turned to him, if you remember?

A. I didn't notice.  I was waxing the coach and wasn't looking that way.

*       *       *

11

Q. So obviously you know dangers can be, excuse me, you know ladders can be very dangerous?

A. Absolutely.

Q. Especially if you're working by yourself?

A. Yes.

\*　　\*　　\*

Q. Okay. Do you accept any of the responsibility for what happened to him?

A. I feel guilty it happened. I feel I provided [an] opportunity for [plaintiff] to get hurt. I could have done more to prevent the accident.

Q. And again, if you'd been holding the ladder it wouldn't have fallen?

A. True.

From this testimony, we hold that defendant assumed a duty to stabilize and secure the ladder while plaintiff was working on it. Both parties testified that defendant would hold the ladder at times to ensure plaintiff was working safely. Plaintiff stated that "on occasions when the ladder was not safe," or defendant "felt it was not stabilized[,] he would hold the ladder while [plaintiff] worked on the upper areas." It is undisputed that the ground on which the ladder was standing was not level. It was sloped away from the RV, so that the left side of the ladder was lower than the right. There are photographs in the record depicting the sloping ground where the accident happened. Defendant stated that he was aware of the dangers of working on a ladder alone. Under the circumstances established by the record, it was foreseeable that the ladder might fall and cause injury to plaintiff in the absence of someone holding and securing it. Moreover, the alternative conduct that would have prevented the harm – holding the ladder on the sloping ground – is not overly burdensome. Indeed, it seems to be one of the primary tasks that defendant undertook in the two-person job of waxing his RV. This conclusion is supported by, among other things, two undisputed facts listed in defendant's response to plaintiff's Tenn. R. Civ. P. 56.03 statement of undisputed facts: (1) "On the day of this accident, and prior to [p]laintiff's fall, while [p]laintiff was up on the ladder [d]efendant would be working either behind or in front of [p]laintiff no more than 'arms-length' from the ladder

12

at all times and was always close enough to touch the ladder;" and (2) "Prior to the accident, [d]efendant was working close enough to the ladder while [p]laintiff was on it that he could 'grab' it or could have 'steadied it.' "

Defendant had a duty to exercise due care under the circumstances. The question of whether he breached that duty is one for the trier of fact to determine. We observe that courts in several other jurisdictions have reached a similar conclusion. *See Umile v. Volpe*, 125 So.3d 231, 233 (Fla. Dist. Ct. App. 2013) ("the trier of fact should determine whether appellee accepted the duty to hold the ladder, and if so, whether he negligently performed the action by not holding the ladder"); *Ceneviva v. Ryan Homes*, No. 09-2452 (RBK/AMD), 2011 WL 2470596, at *4 (D. N.J., filed June 20, 2011) ("there is a material issue of fact as to whether Rickards assumed a duty to hold the ladder for Plaintiff. . . . if Rickards agreed to hold the ladder, a reasonable jury could find that he did not do so with reasonable care because the ladder slipped while Plaintiff was on it"). Consequently, summary judgment was inappropriate in this case.

## V.

The order granting summary judgment in defendant's favor is vacated, and the case remanded for further proceedings consistent with this opinion. Costs on appeal are assessed to the appellee, Jerome Hoynacki.

_____
CHARLES D. SUSANO, JR., JUDGE